# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 30, 2003 Session

## TOM HENDERSON, ET AL. v. CITY OF CHATTANOOGA

### Appeal from the Chancery Court for Hamilton County
No. 02-0131 Part 1     W. Frank Brown, III, Chancellor

### FILED SEPTEMBER 29, 2003

### No. E2002-02165-COA-R3-CV

---

Five police officers employed by the Chattanooga Police Department were involved in a physical altercation with Torris Harris ("Harris") which ended with Harris' death. Harris allegedly had ties to the local Crips gang. Pursuant to the Public Records Act, a local news station requested photographs of these five officers as well as a sixth officer who had prepared the official police report. After the request was denied by the City of Chattanooga, the news station filed a petition seeking to compel production of the photographs. After a trial, the Trial Court concluded the photographs were "public records" and the undercover officer exemption found in the Public Records Act did not apply to these officers. The Trial Court also held that disclosing the photographs would not place the officers or their families at substantial risk of harm and, therefore, would not violate the officers' constitutional right to privacy. After ordering production of the photographs, the Trial Court refused to award attorney fees incurred by the successful petitioners. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Phillip A. Noblett and Lawrence W. Kelly, Chattanooga, Tennessee, for the Appellant City of Chattanooga.

Bryan H. Hoss, Chattanooga, Tennessee, for the Appellants Justin B. McCommon and Fraternal Order of Police, Rock City Lodge No. 22.

W. Gerald Tidwell, Jr., Chattanooga, Tennessee, for the Appellants Southern States Police Benevolent Association, Inc., Martin R. Penny, Christopher Smith, Mark A. Smeltzer and David Allen.

Alfred H. Knight and Alan D. Johnson, Nashville, Tennessee, for the Appellees Tom Henderson, Steve Hunsicker, and Freedom Broadcasting of Tennessee, Inc., d/b/a/ WTVC News Channel 9.

Douglas R. Pierce and D. Wes Sullenger, Nashville, Tennessee, for the Appellee Tennessee Association of Broadcasters.

Richard L. Hollow, Knoxville, Tennessee, for the Appellee Tennessee Press Association.

Anthony A. Jackson and Bruce C. Bailey, Chattanooga, Tennessee, for the Appellee Chattanooga Publishing Company.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, and Janet M. Kleinfelter, Senior Counsel, Nashville, Tennessee, for the Appellee State of Tennessee.

**OPINION**

## Background

On December 26, 2001, five police officers with the Chattanooga Police Department ("CPD") were involved in a physical altercation while attempting to subdue Harris, who allegedly had ties with the local Crips gang. Harris died during the physical altercation. Thereafter, a local news station requested photographs of the police officers pursuant to the Tennessee Public Records Act. The City of Chattanooga ("the City") refused to provide the photographs and this lawsuit ensued. The issues involve whether the photographs are public records and, if so, whether they are exempt from disclosure pursuant to the undercover officer exemption found in the Public Records Act. Also at issue is whether production of the photographs would violate the officers' constitutional right to privacy by placing them or their families at substantial risk of harm. The final main issue is whether the Public Records Act violates the Due Process Clause of the Fifth Amendment to the United States Constitution as incorporated into the Fourteenth Amendment.

The factual findings of the Trial Court regarding the events surrounding Harris' death are not in dispute among the parties to this lawsuit. On the relevant date, Officer Justin McCommon ("McCommon") was in full uniform and driving a marked police cruiser. McCommon observed a vehicle "roll" through a stop sign and pull into a nearby driveway. The driver then exited the vehicle. McCommon called to verify the licence tags on the vehicle and decided to investigate further. McCommon approached the driver of the vehicle, Harris, who informed McCommon that he had pulled into the driveway because he was about to run out of gas. After McCommon observed the gas gauge showed the tank was half full, Harris stated he actually had stopped to visit a friend. A civilian ("Civilian") who resided in the house then came outside and informed McCommon that he did not know Harris. When McCommon asked Harris for his drivers license, Harris fled with McCommon in pursuit. The Trial Court described the next sequence of events as follows:

Mr. Harris was able to return to his vehicle, enter the vehicle and start the engine. Officer McCommon was on the outside trying to disengage the vehicle. He was able to remove the keys once but Mr. Harris regained the keys and restarted the vehicle. Officer McCommon was next to Mr. Harris, the driver door was open, and the vehicle was rolling backwards. Officer McCommon's use of mace on Mr Harris had no effect. The civilian offered to help and he and Officer McCommon were able to get Mr. Harris from the vehicle. The vehicle had stopped against a fence. Mr. Harris was struggling. Officer McCommon again tried to use his mace on Mr. Harris. However, the struggle was such that Officer McCommon was adversely affected by the mace.

Officer McCommon had called dispatch when the chase began. In a short time four CPD officers (Allen, Smeltzer, Smith and Penny) arrived at the scene. The civilian and Officer McCommon were removed from the struggle. Mr. Harris was trying to headbutt the officers. He bit Officer Penny. An ambulance was called for Penny and McCommon. The four other officers were trying to get Mr. Harris handcuffed to stop his struggle and fight. He was finally cuffed after a choke or sleeper hold was applied to his neck. The Officers noticed that Mr. Harris was limp. They uncuffed him and started resuscitation measures. Upon arrival the paramedics continued with life-saving efforts. However, Mr. Harris was pronounced dead at the hospital. The cause of death was listed as blunt trauma to the neck. Obesity was also listed as a factor. Mr. Harris was described as 5'6" tall and 230 pounds.…

The next day, a car containing several people stopped in front of the house where these events occurred and threatened the Civilian's wife. A few days later, a retired CPD Lieutenant, C.L. Wilhoite, Jr. ("Wilhoite"), saw three young men purchasing a large amount of ammunition at a local WAL☆MART store and overheard them discussing a wake which was to take place the next day. The only wake known by CPD to be taking place the next day was that of Harris. Wilhoite testified all three of these men were wearing blue clothing, a color which has been an identifying color of the local Crips gang. When Harris was fourteen years old, he was arrested for carrying a firearm and at that time identified himself as a member of the East Side Crips. Harris was wearing blue camouflage clothes and blue tennis shoes on the day he died.

The five officers involved in the incident were placed on administrative leave with pay, which lasted for sixteen (16) days. An investigation into Harris' death was conducted by CPD and the Tennessee Bureau of Investigation. These agencies ultimately found no criminal wrongdoing by the five officers and no criminal charges were filed. When the investigations were completed,

a report was released to the public discussing the findings made by the agencies. This report contained the names of the five officers.

The Trial Court discussed two other events which it concluded were relevant to the issues in this case. First, a cousin of Harris was arrested and made threatening remarks to the police officers because Harris had been killed. Second, two officers stopped a man whom they thought had an outstanding arrest warrant for robbery. This person had no identification and was handcuffed briefly while the officers verified his identity. He was released when the officers determined he was not the person who was wanted for robbery. This individual thanked the officers for being nice to him, then said that "the *** men who did that [killed] to Rooster (Mr. Harris) should be dealt with."

Approximately one month after Harris died and prior to completion of the investigation into Harris' death, Tom Henderson ("Henderson"), an Assistant Manager for Channel 9 in Chattanooga, sent a letter to CPD requesting, among other things, photographs of the five officers directly involved in the Harris incident. Henderson also requested the photograph of Officer Matthew Webb ("Webb"), the officer who prepared the official police report on the events of December 26. CPD refused to release these six photographs, claiming their release could jeopardize the ongoing investigation and were otherwise protected from disclosure by the officers' constitutional right to privacy. Thereafter, Steve Hunsicker ("Hunsicker"), the News Director for Channel 9, sent a follow-up letter requesting the same photographs. CPD maintained its position that the photographs were not subject to release for the reasons previously cited. Both letters from Channel 9 specifically stated the requests for the photographs were being made pursuant to the Public Records Act.

This litigation began when Henderson, Hunsicker, and Freedom Broadcasting of Tennessee, Inc., d/b/a WTVC News Channel 9 ("Freedom Broadcasting"), filed a petition against the City seeking access to the photographs of the six police officers. They requested the Trial Court enter an order requiring the City to show cause why the photographs should not be furnished and for an award of attorney fees because the City had willfully refused to turn over the photographs in violation of the Public Records Act.

After the original petition was filed, numerous individuals and entities intervened in this litigation either in support of or in opposition to producing the photographs. For ease of reference, we will collectively refer to all of the parties who seek production of the photographs as "Petitioners." These include: Henderson, Hunsicker, Freedom Broadcasting, Chattanooga Publishing Company, the Tennessee Association of Broadcasters, the Tennessee Press Association, Inc., the Society of Professional Journalists, and the Tennessee Associated Press Managing Editors.

Since the City opposed release of the photographs, we will collectively refer to all of the parties who oppose release of the photographs as "Respondents." These include: the City of Chattanooga, Officers Justin McCommon, Martin Penny, Christopher Smith, Mark Smeltzer and

David Allen, the Fraternal Order of Police, Rock City Lodge No. 22, and the Southern States Police Benevolent Association.[1]

The final party to this litigation is the State of Tennessee. The state is a party because Respondents have challenged the constitutionality of Tennessee's Public Records Act. The state maintains the Public Records Act is constitutional and takes no position on whether the photographs should be produced.

The various issues at trial and on appeal pertain only to production of the photographs of the six officers. The trial was in July of 2002 and the City's first witness was William Shelley Parker, Jr., ("Parker"), a local attorney and legal advisor for the City. Parker testified that there was an ongoing investigation being conducted by CPD's Major Crimes Unit surrounding the circumstances of Harris' death at the time of Petitioners' original request. As such, CPD had concerns that releasing the photographs could compromise the integrity of that investigation. Parker also testified that undercover police officers have a constitutional expectation of privacy in certain personnel information and referenced an opinion by the United States Court of Appeals for the Sixth Circuit so holding. It was for these reasons CPD denied release of the photographs. Parker advised that other portions of the officers' personnel files were made available to Petitioners, although he was not aware if these records ever were inspected. Parker explained that upon receiving the requests for the photographs, he sent an email to the six officers inquiring if any of them desired to waive their constitutional right to privacy so their photographs could be given to the news media. All six officers declined this invitation.

According to Parker, the investigation being conducted by the Major Crimes Unit was not closed until May or June of 2002. Parker was concerned that until this investigation was completed, releasing photographs of the officers could jeopardize the investigation because a witness could "make up stuff" about an officer if that witness was able to identify a specific officer prior to being interviewed. Parker testified Harris had ties to a local gang. Parker also stated a threat had been made to the wife of the Civilian who had assisted McCommon in subduing Harris. This threat intensified concerns that the gang would retaliate against the officers and/or their families if their identities were made public. Parker then described the dilemma in which the City had been placed by Petitioners' request for photographs. If the City did not release the photographs, it was subject to being sued by Petitioners to compel production. If the City did release the photographs, it was subject to being sued by the officers claiming a violation of their federal constitutional right to privacy.

---

[1] The original Petitioners initially sought personnel information and pictures of *all* officers employed by CPD, except those serving in an undercover capacity. As this case developed, however, the original Petitioners twice amended their petition and eventually limited their request only to the photographs of the six officers identified above. Approximately eleven CPD officers who were not directly involved in the events of December 26 originally were allowed to intervene. Once Petitioners narrowed their request, these eleven claims were dismissed for lack of standing. The dismissal of these claims is not at issue on appeal.

Parker testified the job description for every CPD officer states that the officer can be assigned to perform any duty the Chief of Police deems fit, which would include undercover assignments. Therefore, "every officer in the department is subject to an assignment in an undercover capacity or a covert capacity." Parker stated there are approximately 450 CPD officers and an additional 49 cadets in the academy. Parker acknowledged, however, that it would not be practical to assign every officer to undercover work and some of the officers have been "in the press too much" to be effectively used in an undercover capacity. Parker admitted CPD's web page contains pictures of several uniformed officers, including those who have won awards.

The City's next witness was Sergeant James Timothy Carroll ("Carroll"), a twenty year veteran of CPD, currently assigned to the Crimes Against Persons Unit of the Major Crimes Division. Carroll was involved in the homicide investigation of Harris' death. According to Carroll:

> In this particular case, we had several officers involved. We had … [two] civilians involved. If we gave out detailed information about the case – photographs, anything like that – and if I wanted to put together a photo lineup to show a witness that may have seen something, it would compromise that photo lineup. It would taint it.

Carroll testified the investigation was conducted to determine if a criminal act was committed by the officers and Civilian involved in the incident. The investigation was completed in May of 2002 and no photo line-ups were ever used in the investigation.

The fact that Harris had been involved in a gang concerned Carroll about the safety of the officers, as well as the safety of the Civilian and his wife. Carroll opined that if the photographs were made public, the safety of the officers and their families would be placed in jeopardy even though the officers were cleared of any criminal wrongdoing. Carroll went on to add that regardless of what gang affiliation someone may have, once a member of the gang is killed the other gang members "will and have retaliated." As part of his investigative file, Carroll maintained a police report detailing the threat made to the Civilian's wife in addition to the information provided by Wilhoite concerning several young men who were wearing blue clothing and buying a large amount of ammunition. Carroll admitted, however, that he was not aware of any threats made directly to the five officers involved in the struggle with Harris. Other than Harris identifying himself as a member of the Crips when he was arrested several years ago, Carroll was not aware of any "positive connection" establishing Harris as a gang member.

Carroll testified that he was not suitable for undercover work because he has had too much public exposure and would be recognized too easily. When asked what type of officer he would use in an undercover capacity, Carroll stated:

> We like to get an officer that would like to work in our unit, younger officers with several years of experience, or at least up to their third year or about to be able to go to investigative mode, put

them in an environment where they're not identifiable like most of us who have been on TV. They can extract information, do surveillance, where I couldn't do that without just having to have completely darked-out windows or something. They could drive up in fairly open windows and not be recognized as police.

Carroll stated an officer's safety would be compromised if he was engaged in undercover work and his picture made public. Carroll acknowledged that the five officers involved in the physical struggle with Harris were uniformed police officers who drove marked police vehicles. Uniformed officers generally have more contact with the citizens than any other type of officer employed by CPD. Carroll described CPD as "community-oriented." CPD actively encourages uniformed officers to get to know the citizens on their "beat." Carroll admitted some of the most effective officers are those which have established a good rapport with the community in which he or she serves.

The City's next witness was Deputy Chief Steve Parks ("Parks"), a twenty-four year veteran of CPD in charge of Major Investigations and Support. This unit investigates homicides, narcotics violations, vice, auto theft, and fraud, among other things. Parks utilizes undercover officers in these types of investigations and acknowledged any officer with CPD is subject to being assigned undercover work. According to Parks, there is a "normal benchmark" of using officers with at least three years of experience for undercover assignments, although exceptions have been made. The amount of public exposure an officer has will impact which officer is assigned undercover work. Those with longer tenure are less likely to be given undercover assignments as they are more likely to be recognized in the community as a police officer. Parks described undercover assignments as "very dangerous" because they typically involve investigating "very violent and dangerous people." According to Parks, the majority of the officers directly involved in the Harris incident have two to two and one-half (2 - 2 ½) years of experience and are part of CPD's pool of potential undercover officers. Parks then added that all five officers have expressed an interest in performing undercover work. If pictures of these officers are made public, it could "potentially" impact CPD's ability to utilize them in an undercover capacity.

The next witness was Sergeant Edwin McPherson ("McPherson") who has been employed by CPD since 1992. McPherson testified he worked in an undercover capacity several years ago and during that time made undercover drug purchases. While performing this undercover work, McPherson was present when there was an incident involving another officer hitting "a guy's head on a car." This incident was caught on film and contained shots of McPherson in plain clothes. After the film was broadcast on the news, McPherson tried to make an undercover purchase and his life was threatened when the person from whom he was attempting to make the purchase told him that he had seen McPherson on the news. After this happened, McPherson no longer worked undercover.

McPherson also described an event where he was at McDonald's with his seven year old daughter. A person named Edgar Bailey approached McPherson stating he knew who McPherson was. McPherson did not know who Bailey was at that time. Bailey threatened to "blow

[McPherson's] brains out," and this threat was made in front of McPherson's daughter. McPherson testified to a separate incident involving his sister which took place shortly after the McDonald's incident. Specifically, several people were attempting to shoot bullets into his sister's house. However, they shot into the wrong house and "riddled" the house of a preacher who lived next door to his sister. McPherson then testified:

> After the case went to court and they were found guilty, they come back that night again and shot at my sister's house, who was eight months pregnant at the time. One of [the] bullets – she had the refrigerator door open, and the bullet went by her head and blowed a hole that big into the refrigerator. (Indicating).

The case that went to court to which McPherson was referring involved a criminal action brought against a relative of Edgar Bailey. At least two arrests were made for shooting into the house of the preacher and McPherson's sister, and one of those arrested was Edgar Bailey. McPherson attributes the shooting at his sister's to the publicity he received a couple of years previously when the footage was shown on the news showing him in plain clothes. Notwithstanding the foregoing, McPherson admitted he subsequently was featured on the Fox television show COPS and that he had agreed journalists could accompany him while filming his day-to-day police activities. McPherson cited he had no problem with the COPS filming because he had "been exposed anyway" and no longer performed undercover assignments.

The first officer to testify that was directly involved in the Harris incident was Officer Martin Roy Penny ("Penny"). Penny is a patrol officer with CPD who is assigned to patrol an area of Chattanooga which he describes as having "the highest crime rate in the City." Penny testified he was in the pool of CPD officers who could be selected for undercover work. Penny has specifically expressed his desire to work undercover assignments. According to Penny, release of a posed photograph, such as the photograph contained in his personnel file, would put him and his family at risk. Penny admitted he has had "quite a bit" of exposure in the local media in the past. He was briefly on the news going into a courtroom to testify before a grand jury and gave several on-camera interviews when he worked for the Red Bank Police Department. Penny recently won the Patrol Officer of the Year award and the ceremony was videotaped by local news agencies, although Penny declined to give any interviews. Penny acknowledged that quite a few of the citizens in the high crime area he patrols know him by name. Penny testified that he was involved in another "in-custody death case" while employed for the Soddy Daisy Police Department. As a result of this other incident Penny was sued for alleged civil rights violations. Although the lawsuit eventually was dismissed, it was covered by the local news media. Penny stated his involvement in the Harris incident made him a target for gang retaliation. Penny was aware of the threat that was made against the Civilian's wife as well as the large ammunition purchase made shortly after Harris died.

Penny described a situation where he was involved in detaining a suspect for a brief period of time until he could determine if the suspect had an outstanding arrest warrant. This suspect, while being detained, told Penny he was a "cool cop" and "[t]hem cops that done that to

Rooster (i.e., Harris), they got to be dealt with." The suspect obviously did not know Penny was one of the officers involved in the Harris incident. Penny acknowledged that quite a few of the citizens in his patrol area know his name. Penny has taken steps when possible to make sure his home address and unlisted telephone number are not made known. Penny owns his home and his name and home address are contained in the public records of Hamilton County tax assessor.

Officers McCommon, Smith, Allen and Smeltzer also testified at trial. Their testimony generally was consistent with that of Penny to the effect that: (1) they were in the pool of officers available for undercover work; (2) they wanted to perform undercover work in the future; (3) publication of their photos would, in their opinion, put them and their families at great risk; (4) they did not want their photograph published; (5) they were aware of the threat made to the Civilian's wife; (6) they were aware of the large ammunition purchase made shortly after Harris died; and (7) their job necessarily requires them to interact with the general public on a daily basis. In addition to the foregoing, McCommon testified his job has required him to go into the homes of Crips gang members from time to time. Sometimes the gang members have been suspects in a crime and at other times they have been the victims. Smith also testified that his property tax records were in the "public domain" and his telephone number was listed. Allen testified his face was seen on the COPS footage for about 10 seconds.

The City's final witness was Jimmy Dotson ("Dotson"), who has been CPD's Chief of Police since October of 1997. Dotson testified it was his decision not to release the photographs of the six officers. Dotson made this decision because of the "possibility that some of our officers could've been at risk and could've been in harm's way. Not only the officers, but also their family members." Dotson was aware of the threats made to the Civilian's wife as well as the ammunition purchase when this decision was made. The names of the officers involved in the Harris incident were released to the public, but not until the investigation into Harris' death had been completed.

On August 13, 2002, the Trial Court issued a very thorough and considered Memorandum Opinion. After discussing the relevant facts, the Trial Court concluded there were essentially three primary issues to be decided:

> First, is the release of the photographs prohibited by any constitutional right of privacy which these officers possess? Second, is the release of the photographs excepted by the [Tennessee Open Record Act's] police undercover exception? Third, if the photographs are released, should Chattanooga be ordered to pay the reasonable attorney's fees for (some or all of) the Petitioners?

The Trial Court began its analysis by observing that undercover police officers have a federally protected constitutional right to privacy regarding dissemination of certain personal information, as set forth in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). According to the Trial Court, the Sixth Circuit held in *Kallstrom* that information such as addresses and phone numbers contained in an undercover police officer's personnel file may well be protected

from disclosure under the Due Process Clause of the Fourteenth Amendment if disclosure would place the officer or his or her family at substantial risk of serious harm. After noting this was a high standard to prove, the Trial Court concluded Respondents had not shown that release of the photographs would place the officers or their families at a substantial risk of harm. Next, the Trial Court held that the undercover officer exception contained within the Public Records Act did not apply to the officers in the present case, refusing to read the exception "to include any officer who could at any time possibly work in an undercover or covert role." Next, the Trial Court concluded that while production of the requested photographs would be ordered, the City's refusal to produce them was not in bad faith and an award of attorneys was not appropriate. Because the officers had been accorded due process, the Trial Court specifically declined to reach the issue of the whether the Public Records Act was constitutional and met the procedural due process requirements set forth in *Kallstrom*.

Both Petitioners and Respondents appeal the Trial Court's final judgment.[2] Petitioners claim the Trial Court erred when it refused to award their attorney fees. Respondents raise several issues. With regard to the Tennessee Public Records Act, Respondents claim the photographs are not "public records" and, even if they are, they are exempt from disclosure pursuant to the undercover officer exception. Respondents also claim the photographs are exempt from disclosure because they were part of an ongoing criminal investigation being conducted at the time the request was made. Respondents also raise two federal constitutional issues. First, they claim if the photographs are public records and not otherwise exempt from disclosure under Tennessee law, then the officers' constitutional right to privacy prohibits their release. Finally, Respondents argue the Public Records Act violates their right to procedural due process.

### Discussion

The factual findings of a trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Initially, we will discuss Respondents' claim that the photographs did not have to be produced because they were part of an ongoing criminal investigation into Harris' death. Respondents claim that when the letters requesting the photographs were sent by Henderson and Hunsicker, the criminal investigation was ongoing and the City did not have to turn them over. Respondents then argue that the ongoing criminal investigation protected disclosure, even after it was no longer ongoing, because Petitioners never renewed their request once the investigation was

---

[2] All of the various Petitioners and Respondents have filed briefs and participated in this appeal. For ease of reference, we have identified the issues as being raised collectively by either Petitioners or Respondents, even though one or more of the actual parties may not have joined in raising a particular issue.

complete. We disagree. For present purposes only, we will assume that the ongoing criminal investigation into Harris' death somehow protected the photographs in the officers' files from disclosure at that time. Nevertheless, because Petitioners were litigating the propriety of their request and because the investigation was completed prior to trial, we believe the initial requests should be deemed ongoing for purposes of this litigation. As Petitioners' request remained pending after the criminal investigation was over, the request was pending at the time of trial and there was no ongoing criminal investigation at that time. We find this position of Respondents to be without merit. Having rejected this argument, we now turn to the remaining issues, and we will begin with the state law issues.

## I.    The Tennessee Public Records Act.

The Public Records Act ("Act") is found at Tenn. Code Ann. §§ 10-7-503 through 10-7-507 and generally provides that, with certain exceptions, all state, county and municipal records shall be open to the public. The Act is to be construed broadly "so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d). When inspection of public records is denied, the burden of proof is on the official who possesses the records to prove by a preponderance of the evidence that there was justification for nondisclosure. Tenn. Code Ann. § 10-7-505(c).

There are several sections of the Act which are relevant to this appeal, beginning with §10-7-503(a), which states as follows:

> Except as provided in § 10-7-504(f), all state, county and municipal records …, except any public documents authorized to be destroyed by the county public records commission in accordance with § 10-7-404, shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

Tenn. Code Ann. § 10-7-503(c) discusses inspection of personnel records of law enforcement officers, providing:

> (1) Except as provided in § 10-7-504(g), all law enforcement personnel records shall be open for inspection as provided in subsection (a); however, whenever the personnel records of a law enforcement officer are inspected as provided in subsection (a), the custodian shall make a record of such inspection and provide notice, within three (3) days from the date of the inspection, to the officer whose personnel records have been inspected:
>
> > (A)    That such inspection has taken place;

(B) The name, address and telephone number of the person making such inspection;

C) For whom the inspection was made; and

(D) The date of such inspection.

(2) Any person making an inspection of such records shall provide such person's name, address, business telephone number, home telephone number, driver license number or other appropriate identification prior to inspecting such records.

The exception noted in the previous section is § 10-7-504(g) which applies to inspection of personnel information of designated undercover police officers. The relevant portion of this statutory exception to disclosure states:

10-7-504(g)(1)(A) Personnel information of any police officer *designated as working undercover* may be segregated and maintained in the office of the chief law enforcement officer. Such segregated information shall be treated as confidential under this subsection (g). Such segregated information is the address and home telephone number of the officer as well as the address or addresses and home telephone number or numbers of the members of the officer's household and/or immediate family. Information in such file which has the potential, if released, to threaten the safety of the officer or the officer's immediate family or household members may be redacted if the chief law enforcement officer determines that its release poses such a risk.

(B) If the person requesting the information or the officer disagrees with the determination of the chief law enforcement officer, the decision shall be reviewed in a show cause hearing in chancery court.

Tenn. Code Ann. § 10-7-504(g)(emphasis added).[3]

---

[3] Tenn. Code Ann. § 10-7-504(f)(1) provides that certain information of public employees in the possession of a governmental entity is to be treated as confidential. Specifically, this section protects from disclosure a public employee's "unpublished telephone numbers; bank account information; social security number; driver license information except where driving or operating a vehicle is part of the employee's job description or job duties or incidental to the performance of the employee's job; and the same information of immediate family members or household members."

**A. Whether the Photographs of the Six Officers are "Public Records" as Defined Under the Act.**

When creating the Public Records Commission at Tenn. Code Ann. § 10-7-301 *et seq.,* the legislature also defined the various different types of records over which the Commission had responsibility, including the following definition of public records:

> "Public record or records" or "state record or records" means all documents, papers, letters, maps, books, *photographs*, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics *made* or received pursuant to law or ordinance or *in connection with the transaction of official business by any governmental agency* ….

Tenn. Code Ann. § 10-7-301(6)(emphasis added). Although this definition is not contained within what is commonly referred to as the Public Records Act, our Supreme Court relied on § 10-7-301(6) in *Griffin v. City of Knoxville*, 821 S.W.2d 921 (Tenn. 1991) when concluding a deceased's handwritten notes confiscated by the Knoxville Police Department during a homicide investigation were public records open to inspection under the Act. Accordingly, we will use this definition in the present case when determining whether the pictures of CPD officers are public records. It is also noteworthy that the *Griffin* Court reiterated its previous approval of this Court's opinion in *Board of Education v. Memphis Publishing Co.*, 585 S.W.2d 629 (Tenn. Ct. App. 1979) and our description of the Act as "an all encompassing legislative attempt to cover all printed matter created or received by government in its official capacity and whether intended to be retained temporarily or retained and preserved permanently." *Griffin*, 821 S.W.2d at 923 (quoting *Board of Education v. Memphis Publishing Co.*, 585 S.W.2d 629, 630 (Tenn. Ct. App. 1979)).

As with any employer, CPD gathers certain information which it maintains in each employee's personnel file. Some of this information is required to be maintained by various federal and/or state laws, such as the federal immigration, social security, and income tax codes. In light of the very broad definition of public records and giving the Act a liberal construction, as we must, we cannot say that when a photograph of an officer is taken and placed in his or her personnel file, that it was not "made … in connection with the transaction of official business by any governmental agency." Tenn. Code Ann. § 10-7-301(6). To do so would require us to make a blanket pronouncement that preparing and maintaining personnel files on officers and other employees is not part of CPD's official business. We are not willing to make such a holding even though a personnel file also may contain information an employer is not legally required to maintain, such as a photograph.

The issue of whether photographs of law enforcement personnel can be subject to disclosure under the Act was addressed recently by the Western Section of this Court in the unreported opinion of *Contemporary Media, Inc. v. Gilless*, No. W2000-02774-COA-R3-CV, 2002 Tenn. App. LEXIS 409 (Tenn. Ct. App. June 3, 2002), *no appl. perm. appeal filed*. In *Gilles*, a local

-13-

newspaper sought disclosure of photographs from the personnel files of nineteen recently hired deputy sheriffs in Shelby County. This Court noted that law enforcement personnel records were open for inspection by the public pursuant to Tenn. Code Ann. § 10-7-503(c)(1), unless exempted by § 10-7-504(g). *Gilless*, 2002 Tenn. App. LEXIS 409, at * 7. Although the precise issue of whether the photographs of the deputies constituted public records as defined in the Act was not before the *Gilless* Court[4], it nevertheless observed that "the parties do not dispute that the requested photographs are contained in the officers' personnel files. Thus, absent a statutory exemption, the Public Records Act requires that the photographs be disclosed." *Id.* In the present case there also is no dispute that the requested photographs are contained within the officers' personnel files.

We conclude: (1) the photographs of the six officers are "public records" as defined in Tenn. Code Ann. § 10-7-301(6); and (2) the photographs are law enforcement personnel records subject to inspection under § 10-7-503(c), unless exempt from disclosure under § 10-7-504(g).

###### B. Whether the Undercover Officer Exemption in Tenn. Code Ann. § 10-7-504(g) Protects the Officers' Photographs from Disclosure.

Resolution of this issue requires a closer examination of the *Gilless* opinion. The *Gilless* Court concluded the photographs of the nineteen newly hired deputy sheriffs were covered by this exemption, reasoning as follows:

> Tennessee Code Annotated § 10-7-504(g)(1)(A) provides that certain personnel information may be segregated and treated as confidential regarding a police officer "designated as working undercover." Contemporary Media notes that the record below does not establish that any of the nineteen newly hired police officers were actually working on an undercover assignment at the time of the hearing in the trial court below. However, witnesses for the sheriff's department made it clear that all nineteen new officers were considered part of the pool of officers immediately available for undercover assignments. The witnesses explained that the department favors using new officers for undercover work because, first, they are the appropriate age to infiltrate gangs, drug networks, and other criminal groups and, second, their lack of public exposure makes it less likely that they will be recognized as police officers. The sheriff's department would not use an officer in an undercover

---

[4] In *Gilless*, the sheriff's department did not claim the photographs were not public records. *Gilless*, 2002 Tenn. App. LEXIS 409, at * 3. In the present case, Officer McCommon and the Fraternal Order of Police, Rock City Lodge No. 22 admit the photographs are public records. While the Southern States Police Benevolent Association, Inc., and Officers Penny, Smith, Smeltzer, and Allen do not expressly deny the photographs are public records, they nevertheless invite this Court to hold that they are not as a "way of avoiding" the constitutional issues. As tempting as this invitation is, we must respectfully decline.

operation once the officer's face had been exposed in a newspaper or on television.

We cannot agree with the contention that the phrase "designated as working undercover" must be limited to officers who are actually working on an undercover assignment at the time of the request for the personal information. To hold otherwise would be in effect to preempt the use of the newly hired officers for undercover duty in the future, since the public exposure of the officer's face would put him or her at risk of being recognized. Therefore, we conclude that the phrase "designated as working undercover" as used in Tennessee Code Annotated § 10-7-504(g)(1)(A) would include officers such as the nineteen newly hired officers at issue in this case, who were designated as in the pool of officers immediately available for undercover assignment.

*Gilless*, 2002 Tenn. App. LEXIS 409, at ** 7 - 9 (footnote omitted).

The *Gilless* Court made another holding which is pertinent to this case. Contemporary Media argued the statute only exempted "the address and home telephone number of the officer as well as the address or addresses and home telephone number or numbers of the members of the officer's household and/or immediate family." Tenn. Code Ann. § 10-7-504(g)(1)(A). Contemporary Media then claimed that because photographs were not specifically included, they were not exempt from disclosure. The sheriff's department relied on different language in the same statutory section and claimed the photographs were exempt because they constituted information "which has the potential, if released, to threaten the safety of the officer or the officer's immediate family or household members may be redacted if the chief law enforcement officer determines that its release poses such a risk." Tenn. Code Ann. 10-7-504(g)(1)(A). Because anonymity is critical to undercover work, the sheriff's department argued the officers' photographs clearly had the potential, if released, to threaten the safety of the officer and his family. *Gilless*, 2002 Tenn. App. LEXIS 409, at ** 9, 10. This Court agreed with the sheriff's department, noting that the two segments of the statute should be construed together in light of the general purpose of the statute. We then stated:

[T]he obvious purpose of the exemption is to protect the safety of officers who do undercover work and to enable law enforcement officials to maintain effective undercover operations. Publication of the officers' photographs in a city-wide newspaper clearly threatens the safety of an officer in undercover work and compromises the ability of the sheriff's department to have undercover operations. Under these circumstances, we must conclude that the exemption to the Public Records Act contained in Tennessee Code Annotated § 10-7-504(g)(1)(A) permits the sheriff's department to redact or keep

-15-

confidential the photographs of the nineteen newly hired deputy sheriffs.

*Gilless*, 2002 Tenn. App. LEXIS 409, at ** 11, 12.

In the present case, Respondents rely very heavily on *Gilless* to support their argument that the photographs are exempt because: (1) the officers are in the "pool" of CPD officers immediately available for undercover work; and (2) release of their photographs would either prohibit them from being assigned undercover work in the future or put them in danger if they are used in such a capacity. Petitioners disagree, claiming the undercover officer exemption does not even apply because none of the six officers were designated as working undercover and their photographs were not segregated from their personnel files.

The *Gilless* Court correctly points out that the purpose of the exemption is to protect the safety of undercover police officers and enable law enforcement officials to maintain effective undercover operations. It seems quite clear to us that in order for a law enforcement agency to avail itself of this exemption, the officer(s) must first be "designated as working undercover." Once this designation occurs, the statute then exempts two different groups of records. The first group comprises the address and home telephone number of the officer as well as the address and home telephone number of any member of the officer's household and immediate family. However, in order for these records to be exempt, they must be segregated and maintained in the office of the chief law enforcement officer as specifically required by the statute. Once properly segregated, these records are deemed confidential. The photographs at issue in the present case obviously do not fall within this first group of exempted records.

The second group of exempted records is described in the last sentence of § 10-7-504(g)(1)(A) which states that "[i]nformation in such file which has the potential, if released, to threaten the safety of the officer or the officer's immediate family or household members may be redacted if the chief law enforcement officer determines that its release poses such a risk." A straightforward reading of this last sentence leads us to conclude that it must be referring to something other than what has been specifically identified in the first group of exempt records. It would make absolutely no sense to refer to information which can be "redacted" if that very same information has already been segregated and deemed confidential. Such an interpretation would render the last sentence virtually meaningless. A statute should be construed "so that no part will be inoperative, superfluous, void or insignificant … and to give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *State v. Peele*, 58 S.W.3d 701, 704 (Tenn. 2001)(quoting *Tidwell v. Collins*, 522 S.W.2d 674, 676-77 (Tenn. 1975)).

Information covered by this second group of exempt records need only be redacted prior to being produced or inspected. It does not have to be segregated and maintained in the office of the chief law enforcement officer. Accordingly, the officers' photographs in the present case, though not segregated, can nevertheless fall within the second group of exempt records if the officers have been designated as working undercover and release of their photographs would have the

potential to threaten their safety or the safety of a member of their household or immediate family. Not only is this interpretation consistent with the plain language of the statute, it also affords greater protection to undercover police officers in accordance with the obvious purpose of the legislature in enacting the undercover officer exemption.

The question then becomes whether the officers were designated as working undercover. Unfortunately, the statute offers no guidance on how to designate an officer as working undercover. Obviously, any officers who are actively working undercover have been so designated. If an officer's home address and telephone number, etc., have been segregated and maintained in the office of the chief law enforcement officer, this would certainly go far in establishing that that particular officer has been designated as working undercover.

The trial testimony in the present case establishes that there are approximately 450 active CPD officers. Parker testified every single one of these officers is subject to being used in an undercover capacity. Parker acknowledged, however, that it would not be practical to use every officer in an undercover capacity and some of them already have too much public exposure to perform undercover assignments. We also know that CPD's web page contains photographs of several officers. Any public exposure, including that from the web page, will impact, but not necessarily determine, whether an officer is selected for undercover work. Carroll admitted he would not be suited for undercover work due to the amount of public exposure he has received. McPherson also testified that he has had too much public exposure to be used in an undercover capacity, especially after being featured on the television show COPS. The five officers involved in the physical altercation with Harris testified that: (1) they have not worked undercover yet; (2) they were in the pool of officers immediately available for undercover work; (3) they desired to work undercover at some point in the future; and (4) their level of public exposure to date had not excluded them from being considered for undercover assignments. Deputy Chief Parks testified CPD prefers using officers with at least three years of experience for undercover work, but exceptions have been made. The testimony also establishes that the longer an officer is on the force, the more likely that officer can be identified by the public which could result in exclusion from undercover assignments.

Respondents argue that releasing the photographs of the six officers would preempt their being used for undercover assignments in the future, a result inconsistent with *Gilless*. Taking this argument to its logical end, every CPD officer with less than three years of experience but not too much public exposure would be in the "pool" of officers immediately available for undercover work. It goes without saying that all officers with three or more years of experience but not too much public exposure would likewise be in the "pool." Certainly, all officers who are actively working undercover are in the "pool" as well. The end result is that the vast majority of CPD officers are in the "pool" and the only officers "out of the water" are those few officers who have too

much public exposure.[5]  This result clearly troubled the Trial Court, as evidenced by the following discussion in its Memorandum Opinion:

> [The trial testimony] can be summed up as (almost) all officers are theoretically in a pool from which officers can be taken for undercover assignment.…  The court does not read the undercover officer exception to include any officer who could at any time possibly work in an undercover or covert role.… [The *Gilless]* case appears to be very fact specific.…  The Respondents' interpretation and application of the exception would mean that no police officers' photo would be required to be produced.  The undercover exception would become the rule that no police officers photo would be made public unless the officer (or the City) agreed to such.  Therefore, the court denies the Respondents' contentions that the disclosure of the photographs is exempted by the undercover exception.

We share in the Trial Court's concern.  As a general rule we agree that an officer who is not actively working undercover can nevertheless be designated as working undercover when that officer is in a defined pool of officers immediately available for undercover assignments.  This result will help enable law enforcement agencies to maintain effective undercover operations by lowering the potential that the identity of those officers in the pool will become too well known for them to be effectively used in a covert capacity in the future.  Deciding which officers are best suited for active or future undercover assignments will involve a wide variety of considerations including, but not limited to, an officer's physical ability, skill level, and physical characteristics, as well as the type of criminal activity being investigated.  Without question, the decision as to which particular officers are best suited for undercover work is a decision best left to members of a law enforcement agency, as opposed to trial or appellate court judges.  Once a good faith decision has been made, it should be accorded a high level of deference.  However, even with these considerations in mind this Court cannot overlook the fact that the undercover officer exception is just that – an exception.  It is not the rule.  We agree with the Trial Court's conclusion that "Respondents' interpretation and application of the exception would mean that no police officers' photo would be required to be produced.  The undercover exception would become the rule …."  While there certainly is no mathematical formula for what percentage of officers on a police force can in good faith properly be considered part of the pool of officers immediately available for undercover work, we nevertheless conclude that when it is claimed that the vast majority of a police force has been designated as working undercover, the exception has swallowed the rule and amounts to no designation at all.  Such a result clearly is contrary to the stated legislative intent that the Act is to

---

[5] Our conclusion that a vast majority of the officers have been included in the undercover officer "pool" is reinforced by the following comments in the brief of Respondents Penny, Smith, Smeltzer, Allen, and the Southern States Police Benevolent Association discussing why no information on designated undercover officers was ever segregated from the personnel files:  "[I]t is impossible for the Chief to segregate literally all of the personnel files from the very few that would be left.  It would make more practical sense for him to designate their file room as an annex to his office for segregation purposes."

be construed "so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d). It is for this reason we conclude that the six officers in the present case have not been "designated as working undercover" and the undercover officer exception found in Tenn. Code Ann. § 10-7-504(g)(1)(A) does not protect their photographs from disclosure.

## II.     The Federal Substantive and Procedural Due Process Issues.

### A.     The *Kallstrom* Decisions.

Respondents argue that even if the photographs are not exempt from disclosure under the Act, dissemination of their photographs would nevertheless violate their federal constitutional right to privacy as recognized by the United States Court of Appeals for the Sixth Circuit in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998)("*Kallstrom I*"). In *Kallstrom I*, the three plaintiffs were undercover police officers who were actively involved in a drug conspiracy investigation of the Short North Posse, a violent gang. Forty-one gang members were being prosecuted on drug conspiracy charges and the plaintiffs testified against eight of those gang members. *Kallstrom I*, 136 F.3d at 1059. During the criminal trial, counsel for the gang members requested and obtained from the City of Columbus the plaintiffs' personnel and pre-employment files. Defense counsel then proceeded to give these files to several of the defendants. The files contained a significant amount of personal information on the officers, including their home addresses and telephone numbers and this same information for immediate relatives. Also provided was a copy of the officers' drivers licenses which contained their photographs. *Id.* The City of Columbus believed it was required to provide this information pursuant to the Ohio Public Records Act. *Id.* at 1059-1060.

The three officers brought suit under 42 U.S.C. §§ 1983 and 1988, claiming, among other things, that dissemination of the information violated their right to privacy under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The officers also sought an injunction prohibiting the City of Columbus from releasing any such information in the future. *Id.* at 1060. The United States District Court for the Southern District of Ohio ("District Court") dismissed all of the claims after concluding the Sixth Circuit has consistently refused to recognize a constitutionally protected right to privacy that would shield an individual from a government releasing personal information. *Id.*

On appeal, the decision of the District Court was reversed. In so doing, the Sixth Circuit began by noting that the Due Process Clause of the Fourteenth Amendment contains both procedural and substantive components. The procedural component governs the procedures by which a state may deprive an individual of life, liberty, or property. There are times, however, when the Due Process Clause will bar certain governmental action regardless of the fairness of the procedures used to implement that action. When this happens, the substantive component of the Due Process Clause is implicated. *Id.* at 1060. The Sixth Circuit then observed that one aspect of the substantive component that has developed over the years is the right to privacy, which has developed along "two distinct lines. The first line of cases involves the individual's interest in independent

-19-

decision making in important life-shaping matters, while the second line of cases recognizes the individual's interest in avoiding disclosure of highly personal matters." *Id.* (citing *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977)).

The Sixth Circuit acknowledged that it has narrowly interpreted an individual's right to privacy in avoiding disclosure of personal matter and will only "balance an individual's interest in nondisclosure of informational privacy against the public's interest in and need for the invasion of privacy where the individual privacy interest is of constitutional dimension." *Id* at 1061 (citing *J.P. v. DeSanti*, 653 F.2d 1080, 1091 (6th Cir. 1981)). The issue then was whether the plaintiffs' interests in nondisclosure of their files rose to a level of constitutional dimension. The Sixth Circuit concluded that it did, stating:

> The liberty interests preserved by the Due Process Clause of the Fifth Amendment, later incorporated into the Fourteenth Amendment, include "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. at 399, 43 S.Ct. at 626; *see also Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413-14, 51 L.Ed.2d 711 (1977). Among the historic liberties long cherished at common law was the right to be free from "unjustified intrusions on personal security." *See Ingraham*, 430 U.S. at 673, 97 S.Ct. at 1413.… Individuals have "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity," and this right is fundamental where "the magnitude of the liberty deprivation that [the] abuse inflicts upon the victim … strips the very essence of personhood." *Claiborne*, 103 F.3d at 506-07. Finally, it goes without saying that an individual's "interest in preserving her life is one of constitutional dimension." *Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc).
>
> In light of the Short North Posse's propensity for violence and intimidation, the district court found that the City's release of the plaintiffs-appellants' addresses, phone numbers, and driver's licenses to defense counsel in the [drug conspiracy criminal trial], … as well as their family members' names, addresses, and phone numbers, created a serious risk to the personal safety of the plaintiffs and those relatives named in the files.… We see no reason to doubt that where disclosure of this personal information may fall into the hands of persons likely to seek revenge upon the officers for their involvement in the … [criminal trial], the City created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives. Accordingly, we hold that the City's disclosure of this private information about the officers to

defense counsel in the … [criminal trial] rises to constitutional dimensions, thereby requiring us under *[J.P. v. DeSanti*, 653 F.2d 1080 (6th Cir. 1981)] to balance the officers' interests against those of the City.

\* \* \* \*

In finding that the City's release of private information concerning the officers to defense counsel in the … [criminal] case rises to constitutional dimensions by threatening the personal security and bodily integrity of the officers and their family members, we do not mean to imply that every governmental act which intrudes upon or threatens to intrude upon an individual's body invokes the Fourteenth Amendment. But where the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from a perceived likely threat, the "magnitude of the liberty deprivation ... strips the very essence of personhood." *Claiborne*, 103 F.3d at 506-07. Under these circumstances, the governmental act "reaches a level of significance sufficient to invoke strict scrutiny as an invasion of personhood." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1333 (2d ed.1988).

*Kallstrom I*, 136 F.3d at 1062-1064 (footnotes omitted).

The Sixth Circuit then concluded that when state action infringes upon a fundamental right, it will be upheld under the substantive component of the Due Process Clause only where the governmental action furthers a compelling state interest and is narrowly drawn to further that state interest. *Id*. at 1064. The Court then discussed the compelling state interest furthered by Ohio opening its records to the public, such as shedding light on the government's performance, helping the citizens to understand governmental operations, and helping to ensure accountability. *Id*. at 1064-1065. After discussing these state interests served by Ohio's Public Records Act, the Court assumed the interests served by allowing public access to agency records rose to the level of compelling state interests. The Court went on to conclude, however, that releasing the personal information of the officers' and their family members to the criminal defense counsel did not narrowly serve those interests. *Id*. at 1065. According to the Sixth Circuit:

While there may be situations in which the release of this type of personal information might further the public's understanding of the workings of its law enforcement agencies, the facts as presented here do not support such a conclusion. The City released the information at issue to defense counsel in a large drug conspiracy case, who is asserted to have passed the information onto his clients. We simply fail to see how placing this personal information into the

> hands of the [criminal] defendants in any way increases public understanding of the City's law enforcement agency where the [criminal] defendants and their attorney make no claim that they sought this personal information about the officers in order to shed light on the internal workings of the Columbus Police Department. We therefore cannot conclude that the disclosure narrowly serves the state's interest in ensuring accountable governance. Accordingly, we hold that the City's actions in automatically disclosing this information to any member of the public requesting it are not narrowly tailored to serve this important public interest.

*Kallstrom I*, 136 F.3d at 1065.

The next issue addressed in *Kallstrom I* was whether a state could be held liable for private acts of violence under 42 U.S.C. § 1983. Relying on the state-created-danger theory, the Sixth Circuit concluded that a state can be held liable for the actions of a private individual, such as a gang member, when the state's action places the individual victim "specifically at risk, as distinguished from a risk that affects the public at large." *Id*. at 1066. In such a situation, the state must have known or clearly should have known that its action would specifically endanger the victim. *Id*. Applying this standard, the Court observed that anonymity was essential to the safety of undercover officers investigating a gang-related drug conspiracy, especially when the gang has demonstrated a propensity for violence. When the City of Columbus released the personal information of the officers and their families, it either knew or should have known that it was placing the personal safety of the officers and their families, as opposed to the public at large, in serious jeopardy, and the City of Columbus was, therefore, liable for damages under 42 U.S.C. § 1983. *Id*. at 1067.

The final issue addressed by the Court in *Kallstrom I* involved the plaintiffs' request for an injunction prohibiting the City of Columbus from disclosing personal information in the future. In order to succeed with this request, the plaintiffs were required to show that a failure to issue an injunction likely would result in irreparable harm. *Id*. at 1068. Even though the Sixth Circuit acknowledged irreparable harm would be suffered to the officers or their families if a threat to their security actually materialized, it nevertheless questioned whether any court could adequately assess the likelihood that the officers or their families would suffer harm in the future should personal information once again be released. *Id*. The criminal trial of the gang members had since ended and without a clear development of the factual circumstances accompanying any future release of personal information, any factual finding regarding the potential risk to the safety of the officers or their families would be speculative. *Id*.

Although the plaintiffs in *Kallstrom I* were unable to show denial of injunctive relief likely would result in irreparable harm pursuant to the substantive component of the Due Process Clause, they fared much better under the procedural component. More specifically, the Sixth Circuit held that the procedural component of the Due Process Clause would entitle the officers to injunctive

relief prohibiting the City of Columbus from again releasing personal information prior to giving the officers notice and an opportunity to be heard when disclosure of the requested information could potentially threaten the safety of the officers and their family members. *Id*. at 1069-1070.

After the Sixth Circuit issued its opinion in *Kallstrom I* and the case was remanded to the District Court, various newspapers and television stations requested information on the three officers pursuant to Ohio's Open Records Act. These news organizations sought, *inter alia*, the officers' home addresses, summaries of investigations on their backgrounds, memos and notices related to disciplinary charges, and answers to personal history questions. The requests excluded bank account information, social security numbers, responses to polygraph examinations, and medical or psychological records. *Kallstrom v. City of Columbus*, 165 F. Supp.2d 686, 688 , 694-95 (S.D. Ohio 2001)("*Kallstrom II*"). The City of Columbus refused to provide this information relying on the opinion in *Kallstrom I*, and the news organizations thereafter intervened in the lawsuit.

A most unexpected development then occurred. The District Court was informed that both it and the Sixth Circuit had been provided inaccurate information regarding what actually had been provided to defense counsel in the gang members' criminal trial. The City of Columbus had redacted most if not all of the plaintiffs' personal information from their files prior to their being produced. The files as produced did not contain the address and phone numbers of the officers or their relatives and the drivers licenses had been rendered illegible. Because of this the District Court determined the information that actually had been provided was outdated or redacted and did not result in any substantial risk to the officers or their families. *Kallstrom II*, 165 F. Supp.2d 686, 700-702 (S.D. Ohio 2001). In reaching this conclusion, the District Court observed that it had been almost six years since the criminal defense attorney reviewed the information and there was no evidence that the Short North Posse or anyone connected with that gang had done anything to place the plaintiffs in harm. The officers did testify to mysterious phone calls they received which at least one officer speculated could be attributed to the release of his redacted personnel file. *Id*. at 702. In short, the plaintiffs offered nothing other than conclusory statements to support their claim that the release of the information put them at substantial risk of immediate bodily harm. Accordingly, the District Court concluded the plaintiffs' substantive due process rights had not been violated. *Id.* at 702-703.

Finally, in accordance with the Sixth Circuit's instructions, the District Court entered a limited permanent injunction against the City of Columbus requiring it to provide plaintiffs with meaningful written notice prior to releasing any information which could potentially threaten the personal security of the plaintiffs or their families. "Specifically, the City must notify the Officers of a request for their addresses, phone numbers, and copies of their drivers' licenses, or the names, addresses, and phone numbers of their family members, prior to releasing this information so that the Officers might have the opportunity to invoke their constitutionally protected rights to privacy and personal security." *Id.* at 703-704.

**B. Whether Production of the Photographs Will Violate the Officers' Substantive Due Process Rights.**

Relying on *Kallstrom I*, the officers in the present case contend the Trial Court erred in ordering production of their photographs because broadcasting the photographs on the news would place them and their families at substantial risk of serious bodily harm. The Trial Court correctly observed that this is a very high standard to prove. The precise issue we must decide is whether the evidence preponderates against the Trial Court's factual findings and resulting conclusion that the officers did not meet this high standard.

It is undisputed that the officers involved in the Harris incident are patrol officers who wear their police uniforms and name tags while on duty. They interact with the citizens on their beat frequently, which could and has included members of the Crips gang. CPD is community oriented and actively encourages the officers to interact with the citizens. A couple of the officers have received media coverage for reasons unrelated to the Harris incident, including Allen's brief appearance on COPS. The fact that they are "police officers" is not secret. Their names and involvement in the Harris incident were made public when the investigative report into Harris' death was released. It is the addition of their photographs to this already existing level of public knowledge that they seek to prevent. The trial took place seven months after Harris' death and two months after the officers' names were made public. Fortunately, at the time of trial none of the officers were able to identify any specific threat that had been made to them directly resulting from their involvement in the Harris incident.

The underlying facts in *Kallstrom I* which led the Sixth Circuit to the conclusion that the substantive due process rights of the officers in that case had been violated are quite compelling. The *Kallstrom I* officers were actively working undercover and testifying at the criminal trial of several gang members. Here, the officers neither are actively working undercover nor are they in the midst of a criminal trial of a gang member. We cannot overemphasize the importance of law enforcement personnel to maintaining an orderly society. The fact that their jobs put them in the face of danger on a daily basis cannot be disputed. Nevertheless, after carefully reviewing the facts and the entire record in this case, we cannot conclude the evidence preponderates against the Trial Court's factual findings and resulting conclusion that the officers failed to prove that releasing their photographs would place them or their families at a substantial risk of serious harm. The judgment of the Trial Court on this issue is affirmed.

**C. Whether The Public Records Act Violates the Officers' Procedural Due Process Rights.**

As previously discussed, in *Kallstrom I* the Sixth Circuit concluded the procedural component of the Due Process Clause would require the undercover officers to be given notice and an opportunity to be heard prior to releasing any personal information which could potentially threaten their safety or that of their family members. *Kallstrom I*, 136 F.3d at 1069-1070. The rationale in *Kallstrom I* is not limited to undercover police officers. For example, in *Deja Vu of*

*Nashville, Inc. v. The Metropolitan Government of Nashville and Davidson County*, 274 F.3d 377, 394-95 (6th Cir. 2001), *cert den.* 535 U.S. 1073 (2002) the Sixth Circuit applied the reasoning in *Kallstrom I* when concluding certain personal information regarding exotic dancers and applicants for sexually oriented business licenses was exempt from public disclosure under the Public Records Act when releasing this information would create a substantial risk of harm to the dancers or applicants.

Respondents argue Tenn. Code Ann. § 10-7-503(c) is constitutionally inadequate because it only requires law enforcement personnel to be notified that their personnel files have been inspected within three days after the inspection occurs. In other words, the statute does not provide them *prior* notice and an opportunity to be heard before their records are inspected.[6] Respondents' argument is supported by Tenn. Op. Att'y Gen. No. 98-230, 1998 WL 931489 (1998) where the Attorney General thoroughly reviewed the facts and holding in *Kallstrom I* before concluding as follows:

> Tenn. Code Ann. § 10-7-503(c) requires custodians of such personnel information to allow the public to inspect it, but to obtain information regarding the person making the inspection and to notify the officer whose records have been inspected within three days. Under Kallstrom, however, the custodian of such records is required to give the officer prior notice and an opportunity to be heard if, based on the specific circumstances of the request, the custodian knows or should know that release of the information could potentially threaten the security of the officer or of his or her family members by substantially increasing the likelihood that a private actor will harm them. It therefore appears that Tenn. Code Ann. § 10-7-503(c) does not comply with federal due process requirements where the custodian of information knows or should know that release of information could potentially threaten the personal security of a law enforcement officer or his or her family by substantially increasing the likelihood that a private actor will harm them. Under Kallstrom, in those circumstances, the officer must receive prior notice and an opportunity to be heard.

Tenn. Op. Att'y Gen. No. 98-230, 1998 WL 931489, at * 5.

---

[6] The undercover officer exception contains procedural safeguards when requested information has the potential, if released, to threaten the safety of the officer or the officer's family or household members. We have already concluded, however, that this statutory provision applies only to officers who have been "designated as working undercover." *See* Tenn. Code Ann. §§ 10-7-504(g)(1)(A) and (g)(1)(B). Because we held this exception does not apply to the officers in the present case, it necessarily follows that the procedural safeguards contained within this exception likewise do not apply.

However, under Tennessee law, our courts will not decide constitutional issues unless resolution is absolutely necessary for determination of the case and the rights of the parties. If an issue can be resolved on non-constitutional grounds, "courts should avoid deciding constitutional issues." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). Based on this guiding principle and the factual and procedural history of this case, we must reject Respondents' procedural due process argument regardless of how compelling that argument may seem. The officers here certainly have been accorded their constitutional procedural due process rights inasmuch as they have had a full trial on the merits and, at least so far, one level of appellate review, all without the photographs having been produced. Because the officers have had adequate procedural due process, a decision whether the Public Records Act is constitutional on procedural due process grounds is not absolutely necessary for a determination of this case and the rights of these parties. As Respondents have been accorded their constitutional procedural due process rights in this case, we affirm the Trial Court's handling and ultimate resolution of this issue.

### III.     Whether Petitioners are Entitled to an Award of Attorney Fees.

The final issue is whether the Trial Court erred when it refused to award attorney fees to Petitioners. Tenn. Code Ann. § 10-7-505(g) authorizes an award of attorney fees if the governmental entity knew the records were public and willfully refused to disclose them. The statute also provides an award of attorney fees is discretionary with the trial court. In *Arnold v. City of Chattanooga*, 19 S.W.3d 779 (Tenn. Ct. App. 1999), this Court stated every refusal to disclose a public record was not wrongful because the statute expressed a "knowing and willful" standard, which was synonymous with bad faith. *Id.* at 789 (citations omitted). The Court in *Arnold* went on to add that bad faith was more than bad judgment or negligence and implied the conscious doing of a wrong because of a dishonest purpose. *Id.* In light of the difficult and significant legal issues presented in this case, we cannot conclude the Trial Court abused its discretion when it refused to award attorney fees to the successful Petitioners, and we affirm the Trial Court's judgment on this issue.

### IV.     Conclusion.

This case raises many important issues. As noted by the Trial Court, "the right to privacy under Article 1, § 8 of the Tennessee Constitution, and the United States' Constitution are pitted against Article 1, § 19 of the Tennessee Constitution and the First Amendment to the United States' Constitution relating to freedom of speech and press as well as the mandates of the Tennessee Legislature" with the Public Records Act. The numerous parties to this litigation have furnished this Court with well written briefs and vigorously defended their respective positions. The result we reach today is in no way intended to discount the significant importance of our law enforcement personnel who place themselves in danger on a daily basis to make this nation a safer place to live.

As a final note, we point out that in February of this year, two state legislators from Chattanooga/Hamilton County proposed legislation which would amend Tenn. Code Ann. § 10-7-503(c) and make certain personal information of law enforcement officers, firefighters, and

emergency medical technicians confidential unless the employee authorized its release. The proposed amendment defines personal information to include home addresses, home telephone numbers, social security numbers, names of family members, photographs, and "any other information of a personal nature unrelated to an employee's performance … which, if released, could pose a threat to the safety of an employee or an employee's immediate family or household members." The proposed legislation is SB1049/ HB1785 and is currently pending.

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for further proceedings as necessary, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the City of Chattanooga.

_____

D. MICHAEL SWINEY, JUDGE