# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### ASSIGNED ON BRIEFS JULY 31, 2007

## IN RE: ADOPTION OF M.P.J., dob 1/29/02

**Direct Appeal from the Circuit Court for Gibson County (Trenton)**
**No. 8144     Clayburn Peeples, Judge**

---

**No. W2007-00379-COA-R3-PT - Filed November 28, 2007**

---

This is a case involving the termination of a father's parental rights. The Department of Children's Services instituted a dependent and neglect proceeding and the court granted a protective order removing the minor child from the mother's home. At the time, the father's whereabouts were unknown. The child, almost seven months old, was placed in the temporary custody of her great-aunt. The father subsequently began serving a 56 month sentence in federal prison. When the child was almost five years old, the great-aunt petitioned the court for the termination of both the mother and the father's parental rights and for the adoption of the child. The mother joined in the petition. After a termination hearing, the court announced that the father had abandoned the child, that his rights were terminated, and granted the great-aunt's petition for adoption. The court first entered an order of adoption, but had yet to enter the order terminating the father's parental rights. The court then issued an order of termination, but failed to include any findings of fact. Next, the court issued an amended order of termination with specific findings of fact, *nunc pro tunc* to the termination hearing date. Father appeals, arguing (1) that the trial court failed to make findings of fact; (2) that there is not clear and convincing proof of abandonment; (3) that the Department of Children's Services did not afford him a reasonable opportunity to reunite with the child; and (4) that substantial harm to the child must be proven before a court may constitutionally terminate a parent's rights. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Richard Gossum, Trenton, TN, for Appellant

Joseph E. Tubbs, Humboldt, TN, for Appellee

Robert E. Cooper, Jr., Attorney General and Reporter, Amy T. McConnell, Assistant Attorney General, Nashville, TN, for Intervenor, State of Tennessee

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Jason Randall Johnson ("Appellant" or "Father") is the father of minor child M.P.J., born January 29, 2002. The child's mother is Heather Renee Collins ("Mother"). Mother and Father were never married and have since parted ways. Lois Carson is the great aunt of minor child. ("Appellee" or "Aunt"). This case commenced with proceedings initiated by the Department of Children's Services ("DCS"). Around August 26, 2002, Dyer Police responded to a report of child abuse and neglect at Mother's apartment. Mother and Father's relationship had ended at this point, and Father did not live in Mother's apartment.[1] The investigating officer called DCS because Mother was too intoxicated to care for her four children; all the children were exposed to heavy marijuana smoke in the apartment; there was no milk in the apartment for M.P.J.; and there were only four diapers. On August 29, 2002, DCS filed a petition for temporary custody of M.P.J., alleging that Mother's children, including M.P.J., were dependent and neglected. DCS requested a protective order to immediately remove the children from Mother's home. Father was not given notice of the dependent and neglected proceeding as DCS did not know Father's address or whereabouts.[2] Thus, Father did not participate in the dependent and neglect proceeding. The court granted the petition, and Aunt received temporary care and custody of M.P.J., who was almost seven months old at the time.[3] On June 14, 2004, Father pled guilty to conspiracy to attempt to manufacture methamphetamine. Father began serving his 56 month sentence on January 28, 2005.[4]

On January 23, 2006, Aunt petitioned the court for adoption of M.P.J. In the petition, Aunt alleged that both Mother and Father had willfully abandoned M.P.J., and that their parental rights should be terminated and that a mother/daughter relationship be established between Aunt and M.P.J. Father's answer to the petition denied that it would be in the child's best interest to terminate his parental rights. In his amended petition, Father also alleged that Tenn. Code Ann. § 36-1-113 violates the Tennessee and United States Constitutions. The parties, pursuant to an agreed order,

---

[1] Father testified on recross examination that he and Mother ended their relationship around a week or two before DCS removed the children from Mother's home. According to Aunt, Father and Mother's relationship ended when M.P.J. was one month old, and Father denied paternity up until 2003, when the court ordered a DNA test, which confirmed that he was the father.

[2] At the time, paternity had not been established, but DCS included Father in the petition and protective order as the "alleged father" of M.P.J.

[3] Of Mother's four children, it was believed that Father was the biological father of two – M.P.J. and J.H.C. Father's grandmother took temporary custody of J.H.C., who is not involved in this appeal.

[4] Father transferred from prison in Memphis, Tennessee to Maryland in order to participate in a 500 hour drug education program.

allowed for the Attorney General to intervene in the case for the limited purpose of defending against Father's Constitutional challenge. The court appointed a Guardian *ad litem* for M.P.J. to represent her interest during the proceeding for termination of parental rights and adoption. Due to Father's incarceration, he was unable to attend the hearing; the judge, however, ordered that Father be allowed to participate over the telephone.

Father testified from prison via speakerphone on September 19, 2006. The remainder of the hearing proceeded on January 9, 2007. Father testified that he visited M.P.J. on several occasions prior to his incarceration, and that on several other occasions, Aunt would not accommodate his visits. Father acknowledged that at that time in his life, he had been on drugs and alcohol and had not been a good father, but testified that he has taken steps in prison to better himself, including obtaining his GED, completing a 16 hour parenting class, and completing a drug abuse education course. Father admitted that he was on methamphetamine and "pain pills" while living with M.P.J. and Mother. Father testified that he expected to be released in March of 2007.[5] Father admitted that minor child does not know him and that he had not spent much time with her. On cross-examination, Father admitted that in the two years prior to his incarceration, he had only visited with minor child on five occasions, and could not remember how many times he called Aunt wanting to schedule a visit. Father testified that the first visit he had with minor child while she was in Aunt's custody was on January 31, 2003, at which time the child was one year old. As to Father's attempts to set up visits, he testified as follows:

> Q. Okay. As far as phone calls that were placed to [Aunt] regarding possible visitations, you only placed three of those; isn't that true?
> A. I mean, I can't say for sure because I don't remember them. That's a long time ago.
> Q. And I think you indicated to [your attorney] there would be times when you would call, and for some reason it wouldn't be a good time. Isn't it true there was a period where [Aunt] was going through chemotherapy due to cancer, and she was having her mother help watch [M.P.J.], and that was the reason that she asked you to recall to set up the visitation at a later time?
> A. Right. I mean, there was [sic] times before and after - -
> Q. I'm just asking - -
> A. Right.
> Q. Okay. Prior to this petition being filed - -

---

[5] Father testified that he could be released early and enter a halfway house for six months if he completed a 500 hour drug course. Otherwise, Father would complete his 56 month sentence in September of 2008. Apparently, Father did not complete this 500 hour course as Father states in his brief, filed June 12, 2007, that he is still incarcerated but expects to be released in September of 2007. From the record before us, it is unclear if Father was in fact released in September or is still serving his sentence.

| | |
|---|---|
| A. | Uh-huh. |
| Q. | - - isn't it true that you yourself have not delivered [M.P.J.] any gifts or presents? |
| A. | Yeah. |
| Q. | Okay. After this petition was filed, you sent, I believe, a birthday card to her, and that's the one you were referring to earlier, correct? |
| A. | Correct. |

Father also admitted that Aunt was the only family that M.P.J. knew and that Aunt had been a good parent to M.P.J. When asked why it would not be in M.P.J.'s best interest to terminate his parental rights, Father responded "[b]ecause, I mean, I'm her father, and I love her, you know. I know I haven't been a good father at all, but, like I said, I screwed up on drugs, and I'm looking on changing all that now."

On January 9, 2007, Aunt testified as to her relationship with M.P.J. and Father's lack thereof. Aunt received minor child when DCS initiated the dependent and neglect proceeding and asked Aunt if she would be willing to temporarily care for minor child. Aunt testified that she agreed to take M.P.J. because minor child would otherwise have to go into foster care, as no other family members wanted her. Aunt testified that DCS asked Father's family if they would temporarily care for M.P.J., but they refused because they questioned M.P.J.'s paternity. Aunt retained custody of M.P.J. from the time the child was almost seven months old, to the time of the hearing, at which time minor child would soon turn five years old. Aunt testified that from the time M.P.J. was seven months old until the time of Father's incarceration, Father had visited with minor child a total of five times. Each visit was brief, and at least four of the five visits lasted no longer than two hours. Since Father's incarceration, he has contacted Aunt twice concerning M.P.J., once by sending M.P.J. a hat with no accompanying letter or note, and the second by sending M.P.J. a birthday card. Aunt kept a detailed record, which was entered into evidence, indicating that Father called only three times asking to schedule a visit. Aunt testified that she never refused any of Father's requests to visit with minor child:

| | |
|---|---|
| Q. | At any point, while [M.P.J.] was in your custody, did [Father] call and ask to come visit? |
| A. | Yes, he did. |
| Q. | At anytime was he refused? |
| A. | No, I never refused him. Now, I will say that I was doing chemo treatments. He would call like the early part of the week wanting to know if he could see her at the end of the week. I would ask him to call back at the end of the week because I was sick and we would work something out, and he would miss those calls. He wouldn't call back. He wouldn't. Sometimes he'd go months before he would call me again. I never just refused him to visit the child. |

As to contact with Father's family, Aunt testified that she took minor child to visit Father's grandmother on a few occasions, but since Father's incarceration, there has been no contact. Aunt testified that she has cared for M.P.J. for nearly five years – most of M.P.J.'s life – and considers her like a daughter. She also testified that M.P.J. does not know Father, and that the only family M.P.J. knows is Aunt. If the court were to remove M.P.J. from Aunt's home, Aunt testified that "it would devastate [M.P.J] because she doesn't know anybody but me. She - - she doesn't know what it would be like to live somewhere else . . . ."

Lisa Faulkner, a children's services case manager for DCS, testified that she became involved in the case when the Gibson County Juvenile Court referred her to provide family support services for M.P.J.'s Mother. Her relevant testimony is as follows:

> Q. And how long did you have that case?
> A. About a year - - probably about a year and a half.
> Q. At anytime during that, was Ms. - - or was [M.P.J.]'s father ever involved?
> A. No, sir. He was - - I believe I had had [sic] the case about six months when he was arrested in Fruitland.
> . . .
> Q. Could you describe to the Court your observation of the interaction between [M.P.J.] and [Aunt]?
> A. They have a very strong bond. [Aunt], whenever I would do my home visits, she would take care of [M.P.J.].'s needs. [M.P.J.] was always clean, appeared to be well cared for. When I would observe [M.P.J.] with [Mother] on the few visitations that she had over the weekend, she would want to go back to [Aunt's], and she referred to [Aunt's] as home even when she was with [Mother].
> . . .
> Q. Do you know if [M.P.J.] even knows her father?
> A. As far as I know, she doesn't. She never - - even when she was with [Mother], she never referred to her father.
> . . .
> Q. What do you think based on your experience with [Aunt] and with [M.P.J.], your involvement, these proceedings would be in [M.P.J.]'s best interest?
> A. Yes, sir. I think it would be very traumatic for [M.P.J.] at this point in her life to be removed from [Aunt].
> Q. Okay. Do you feel it would be in her best interest that the parental rights be terminated and [Aunt] be allowed to adopt her.
> A. Yes, sir.

Father's attorney called Valerie Johnson, Father's grandmother, who testified that Father "bought Christmas and stuff for her [M.P.J.'s] birthday, an outfit or something. And he always - - the last when he went in - - before he went in [to prison], he tried to get - - he called [Aunt] trying to get - - able to bring the stuff over, and she was always gone somewhere. So he didn't get to see her [M.P.J.], but he did try." She also testified that she and Father visited M.P.J. on her birthday for about an hour or so, and took gifts to minor child. Ms. Johnson testified that it would not be in M.P.J.'s best interest for the court to terminate Father's parental rights, "because [Father] loves her. He didn't get to see her as much, but he did try on some occasions to see her." On cross examination, Ms. Johnson admitted that she only knew of two times in which Father visited with M.P.J. within the four month period leading up to Father's incarceration. As to Aunt and M.P.J.'s relationship, Ms. Johnson testified as follows:

> Q.    I think you had stated to [Father's attorney] that [Aunt] has taken very good care of - -
> A.    Yeah, she has. I won't say that she - - because she's a well-mannered little girl and smart.
> Q.    Is [M.P.J.] and [Aunt] very closely bonded?
> A.    I'm sure.
> Q.    Do the few times that you've visited with [M.P.J.], have you had an opportunity to see [M.P.J.] and [Aunt] interact?
> A.    Yes.
> Q.    Did they interact as though a loving mother/daughter would?
> A.    Well, I would think so, yeah.

Father called two other witnesses, Pam Flowers and Christina Flowers. Pam Flowers testified that her daughter, Christina Flowers, and Father have a child, twenty months old, unrelated to these proceedings. Pam Flowers testified that she had never been around M.P.J., but did know that Father called Aunt around ten or eleven times attempting to set up a visit:

> Q.    Okay. And what would [Father] be requesting?
> A.    To come see [M.P.J.]. And at Christmas he was trying to get a hold of her to go take her her [sic] gifts, and they was [sic] always saying they was [sic] going somewhere or another or she wasn't there.
> Q.    All right. "She" who wasn't there, the child?
> A.    The child.
> . . .
> Q.    Okay. Were some of these attempts during the four months before [Father] went into the prison system?
> A.    Yes, sir.
> . . .
> Q.    When - - when [Father] would be refused or be told that the child was unavailable and all that, how would that affect him?

-6-

A.      He [sic] was like he was upset, or he would be sad.

Christina Flowers testified that she and Father are in a two-year relationship and that she likewise had never seen M.P.J. Unlike her mother, she testified that she only knew of around four times that Father called Aunt trying to set up a visit with M.P.J. She stated that these attempts occurred around a month prior to Father's incarceration.

At the conclusion of the proof, the court pronounced the order from the bench terminating Father's parental rights and granting Aunt's petition for adoption of M.P.J. Aunt's attorney was to prepare the final decree for the adoption and submit it to the court for approval. On January 18, 2007, the court entered the final decree of adoption approving Aunt's petition for adoption of M.P.J. The final decree states that "all parental rights of Jason Randall Johnson and Heather Renee Collins were terminated in the Circuit Court of Gibson County on January 9, 2007." The order terminating Father's parental rights, however, was not entered until January 23, 2007. This order states, in relevant part, as follows:

> This cause came before the Honorable Clayburn Peeples, Circuit Court Judge, on the 9th day of January, 2007, on a Petition to Terminate Parental Rights and For Adoption . . . . [T]he Court finds as follows:
> 1.      That clear and convincing evidence exists and was presented that the minor child was abandoned by Jason Randall Johnson as defined by current statutory law.
> 2.      That the natural mother joined in the Petition for Termination and that clear and convincing evidence exists and was presented that the minor child was abandoned by Heather Renee Collins.
> 3.      That clear and convincing evidence exists and was presented that Termination of the Parental Rights of the Respondents is in the best interest of the minor child.
> 4.      That it is also in the best interest of the minor child that the Petition for Adoption be granted . . . .
> . . .
> It is therefore **ORDERED, ADJUDGED** and **DECREED**:
>
> 1.      That Jason Randall Johnson and Heather Renee Collins' parental rights are hereby terminated and that the parent/child relationship is permanently severed.
> 2.      *That the written finding of facts and conclusion of law prepared by the Honorable Clayburn Peeples and attached to his Order is hereby fully incorporated herein by reference.*
> 3.      That the adoption is granted and a Final Decree of Adoption will be prepared by the Petitioner's counsel.

All so Ordered this 22 day of January, 2007.

(emphasis added). There were, however, no written findings of fact attached to the order. The court, therefore, issued an amended order on February 12, 2007, *nunc pro tunc* to the 9th day of January, 2007. The amended order terminating Father's parental rights states the court's findings, in relevant part, as follows:

1. That the natural mother joined in the Petition for Termination of Parental Rights and for Adoption.

2. That the natural father willfully abandoned the minor child in that he willfully failed to visit or to engage in more than token visitation for the four (4) month period immediately preceding his incarceration.

3. That the natural father had only visited with the child on approximately five (5) occasions during a more than two (2) year period prior to his incarceration.

4. That the natural father had never sought visitation from the Court while the child was the subject of a Dependent and Neglect proceeding.

5. That the natural father admitted in his testimony that he had not been a good father and had not visited with the minor child on a regular basis.

6. That clear and convincing evidence exists and was presented that the minor child was abandoned by Jason Randall Johnson and Heather Renee Collins.

7. That the minor child did not have a meaningful relationship with her natural father and in fact did not even know him.

8. That the natural father had made no more than token efforts to establish a relationship with the minor child.

9. That the complete lack of a meaningful relationship between the minor child and her natural father was the result of the natural father's own choices.

10. That the natural father has neglected the minor child by abandonment.

11. That the natural father has shown little or no interest in the welfare of the minor child.

12. That the minor child has an extremely strong bond with the Petitioner.

13. That the Petitioner and her family is the only family the minor child really knows.

14. That the minor child has resided with the Petitioner for the majority of her life, since seven (7) months old.

15. That the natural father has even admitted through his testimony that the Petitioner has constantly taken great care of the minor child and that they, the Petitioner and minor child, love each other greatly.
16. That removing the minor child from the Petitioner, now or in the future, would likely have a detrimental effect on the minor child's emotional and psychological well being.
17. That the minor child deserves stability and permanency.
18. That the natural father has not and is not likely in the near future going to be able to establish a safe home and meaningful relationship with the minor child making it in the child's best interest to be returned to him.
19. That clear and convincing evidence exists and was presented that Termination of the Parental Rights of the Respondents is in the best interest of the minor child.
20. That should Termination of the Parental Rights not occur in this case it would result in a substantial harm to the minor child.
21. That it is also in the best interest of the minor child that the Petition for Adoption be granted . . . .

. . .

It is therefore **ORDERED**, **ADJUDGED** and **DECREED**:
1. That Jason Randall Johnson and Heather Renee Collins' parental rights are hereby terminated and that the parent/child legal relationship is permanently severed.
2. That the adoption is granted and a separate Final Decree of Adoption will be prepared and executed . . . .

All so **ORDERED** this 12 day of Feb., 2007, nunc pro tunc to the 9th day of January, 2007.

Father appealed the trial court's decision on February 16, 2007. The court issued a second amended order terminating father's parental rights on May 7, 2007, *nunc pro tunc* to January 9, 2007. Textually, this second amended order of termination is identical to the amended order of termination dated February 12, 2007, *nunc pro tunc* to January 9, 2007. Also on May 7, 2007, the court entered an amended final decree of adoption. This amended decree is also identical to the original decree of adoption dated January 18, 2007, but for an added provision assessing costs of the adoption to Aunt.[6]

---

[6] This Court, on April 20, 2007, entered an Order requiring Father to show cause why this appeal should not be dismissed for failure to appeal an appealable order of judgment because neither the final decree of adoption, the order
(continued...)

## II. ISSUES PRESENTED

Appellant presents the following issues for review, which we slightly reword:

1. Whether this termination of parental rights case should be remanded because the trial court failed to make specific findings of fact as required by statute?

2. Whether the trial court erred in finding that there is clear and convincing evidence that Father willfully abandoned minor child?

3. Whether Father was afforded a reasonable opportunity to reunite with minor child prior to the court's decision to terminate his parental rights?

4. Whether substantial harm to the child must be proven before a court may constitutionally terminate parental rights?

## III. STANDARD OF REVIEW

We review a trial court's findings of fact *de novo* with a presumption of correctness. We will only overturn these factual findings if the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The evidence preponderates against a trial court's finding of fact when it supports "another finding of fact with greater convincing effect." *Nashville Ford Tractor, Inc., v. Great American Ins. Co.,* 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005); *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We give great weight to the trial court's factual findings concerning the credibility of witnesses, *Nashville Ford Tractor, Inc.,* 194 S.W.3d at 425 (citations omitted), and we will not re-evaluate these factual findings unless there exists clear and convincing evidence to the contrary. *Sircy v. Metro. Gov't of Nashville and Davidson County*, 182 S.W.3d 815, 818 (Tenn. Ct. App. 2005) (citation omitted). On the other hand, we review the trial court's conclusions of law *de novo* upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). The lower court's decision to terminate parental rights should be made under a clear and convincing standard, and we look to determine whether the court's findings are supported by a preponderance of the evidence. *In re F.R.R., III*, 193 S.W.3d at 530.

---

[6](...continued)
terminating parental rights, nor the amended order assessed court costs. Upon receipt of these orders entered by the trial court on May 7, 2007, we allowed this appeal to proceed.

## IV.  DISCUSSION

### A.  *Termination of Parental Rights: Findings of Fact*

Father contends that the court failed to make sufficient findings of fact in the original order because no such findings were attached to the order.  Father also points to the fact that the court granted the adoption before the court terminated Father's parental rights.  Aunt admits that the adoption decree was entered prior to the order of termination, but claims that it was "an honest mistake," and that the court remedied the situation by entering the amended order of termination with written findings of fact *nunc pro tunc* to the date of the termination hearing on January 9, 2007.  We agree with Aunt's position.

In termination of parental rights cases, Tennessee law requires that the trial court "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."  Tenn. Code Ann. § 36-1-113(k) (Supp. 2006).  This legislative mandate reflects the necessity of individualized decisions in these difficult cases and also aids appellate review .  *In re K.N.R., et al*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *2 (Tenn. Ct. App. Dec. 23, 2002) (quotation omitted).  When the lower court fails to make such necessary conclusions of fact and law, we generally must remand the case for such *written findings*.  *White v. Moody,* 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004) (emphasis added) ("In most circumstances, the appropriate remedy for the trial court's oversight would be to vacate the judgment terminating [] parental rights and granting [third party's] adoption petition and remand the case to the trial court with directions to file written findings of fact and conclusions of law in accordance with Tenn. Code Ann. § 36-1-113(k).").

As discussed previously, the original termination order stated that "the written finding of facts and conclusion of law prepared by the Honorable Clayburn Peeples and attached to his Order is hereby fully incorporated herein by reference," but no such document was attached.  The court then issued an amended order on February 12, 2007, *nunc pro tunc* to January 9, 2007, which included in the order the required findings of fact.  Trial courts have the inherent power, "and it is their duty, to make their records speak the truth, and a court, therefore, in a proper case, of its own motion, may order a nunc pro tunc entry to be made[.]"  *Lautenbach v. Lautenbach*, Nos. 01A01-9710-CH-00595, 01A01-9703-CH-00098, 1999 WL 326172, at *2 (Tenn. Ct. App. M.S. May 25, 1999) (quoting *McCown v. Quillin*, 48 Tenn. App. 162, 175, 344 S.W.2d 576, 582 (Tenn. 1960)).  "The purpose of rendering an order 'nunc pro tunc' is to make the record speak the truth by giving the order retroactive effect to compensate for the fact that an order previously granted was not entered of record at the earlier time."  *Dewees v. Sweeney*, 947 S.W.2d 861, 863-64 (Tenn. Ct. App. 1996) (citations omitted).  In *Smith v. Smith*, No. W2005-02582-COA-R3-CV, 2006 WL 2052340, at *1 (Tenn. Ct. App. July 24, 2006) (citing *Cantrell v. Humana of Tennessee, Inc.*, 617 S.W.2d 901 (Tenn. Ct. App.1981)), we described an order *nunc pro tunc* as "an entry made now, of something *which was actually previously done*, to have effect as of the former date. Its office is not to supply

omitted action by the court, but to supply an omission in the record of action really had where entry thereof was omitted through inadvertence or mistake." (emphasis added).

The judge pronounced from the bench at the conclusion of the proof that the court was terminating Father's rights and granting Aunt's adoption of M.P.J.: "I find that the proof does show that abandonment has been shown by lack of meaningful contact with the child or attempting to visit the child . . . . I find that the parental rights of both mother and father should be terminated, and I do find that the petition for the adoption of [M.P.J] is well-founded, and I do grant that and change her name herewith and forever . . . . [I]n my findings of fact I do, in fact, find that substantial harm would occur to the child if she were returned to either of her natural parents." The judge reiterated in the original order that he had made findings of fact, but such findings were not attached to the order. It is clear from the transcript and the original order that the judge ruled in favor of Aunt, terminating Father's rights and granting the adoption. Thus, this situation is different than if the court made no findings of fact at all, and a judge issued a *nunc pro tunc* order, for the first time making those required findings of fact. Sufficient findings of fact were included in the amended termination order, with a date relating back to the January 9, 2007 termination hearing. Thus, we believe it would serve no purpose to remand for the purpose of rewriting these same findings. *See In re M.R.W., T.D.B., and A.N.B.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at *4 (Tenn. Ct. App. May 3, 2006) ("[W]here the trial court has made definite and detailed findings of fact and conclusions of law, remand on appeal . . . would serve no purpose."). To avoid confusion in the future, it would be better practice for trial courts to enter their final orders with the finding of facts included in the order, and not attempt to incorporate a separate document containing the necessary findings. And while we agree with Father that termination of parental rights is a prerequisite to adoption, *see In re L.S.S.*, No. E2006-01989-COA-R3-PT, 2007 WL 749629, at *5 (Tenn. Ct. App. Mar. 13, 2007) (quotation omitted), the court remedied its error of entering the order of adoption prior to entering the order of termination by issuing an amended termination order, *nunc pro tunc* to January 9, 2007. Thus, looking to the amended order,[7] the court corrected the timing problem and the best interest of minor child would not be served by extending this matter any further.

Father also argues that the trial judge failed to make sufficient findings of fact as required by Tenn. Code Ann. § 36-1-113(k), because the judge's oral findings were really conclusory statements. This argument has no merit, as "[w]e are concerned with whether the trial court's final written order, not its oral statements to the parties, satisfies the statute." *In re B.L.R.*, No. W2004-02636-COA-R3-PT, 2005 WL 1842502, at *11 (Tenn. Ct. App. Aug. 4, 2005) (citation omitted). A court's obligation to make written findings of fact, however, goes beyond conclusory

---

[7] Father also argues in his brief that "[t]here were no supplemental hearings held at which the purported findings of fact set out in the Amended Order could be addressed by the Appellant or by Appellant's attorney." No supplemental hearing would have been necessary, as the findings of fact were those found on the date of the original hearing. In any event, the amended order indicates that Father's attorney was served with a certified copy of the order and made no objections thereto.

restatements of the law. We dealt with this problem in ***In re K.N.R.***, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *2 (Tenn. Ct. App. Dec. 23, 2002). In that case, the trial court used the phrase "willfully abandoned" throughout the final order, but the Middle Section of this court found that "recitation in a final order that a parent has 'abandoned the child' is a conclusion of law, not a finding of fact. Moreover, placing the statement (abandoned the child) following the popular phrase 'the Court therefore finds' does not transform a conclusion of law into a finding of fact.'" ***Id.*** at *4. Thus, the court vacated the final decree and remanded the matter to the trial court with directions to enter an order with specific findings of fact in addition to conclusions of law. ***Id.*** at *5. In the amended order of termination in this case, the court made the required findings of fact by specifically describing Father's abandonment of minor child, and made the appropriate conclusions of law. Thus, the termination order met the requirements of the Tennessee Code as the written findings of fact were more than conclusory restatements of the law.[8]

## B. Abandonment: Sufficiency of the Proof

Father argues that the proof does not clearly and convincingly establish that he abandoned M.P.J.[9] We disagree.

It is undisputed that "[a] biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." ***In re Giorgianna H.***, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006) (footnotes and citations omitted). Such parental rights, however, are not absolute; rather, such rights continue "without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." ***In re Audrey S.***, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citations omitted).

In order for a court to terminate a parent's rights, it must find at least one of the statutory factors listed in Tenn. Code Ann. § 36-1-113 along with a finding that termination would be in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *see also* ***In re Audrey S.***, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citations omitted). Abandonment is one of the statutory grounds

---

[8] It appears Father is also arguing that the judge did not make the required findings of fact because Aunt's attorney drafted the amended order. The Tennessee Code requires courts to "enter an order that makes specific findings of fact and conclusions of law . . . ." Tenn. Code Ann. § 36-1-113(k). The record indicates that Father's attorney obtained service of process, and the record is devoid of any objection. The judge signed the order and the court entered the order. Thus, this argument has no merit.

[9] On appeal, Father does not argue that terminating his parental rights would not be in M.P.J.'s best interest, or that the proof is insufficient to support such a finding. Thus, we do not address that issue.

-13-

for the termination of parental rights. Tenn. Code Ann. § 36-1-102 defines "abandonment" as it pertains to this case as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2005). The statute goes on to define the "willfully failed to visit" provision as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E) (2005). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C) (2005).

We agree with the trial court that Father only engaged in token visits with M.P.J. Father began serving his sentence on January 28, 2005, and the parties focused on the four months prior to this date. Although Father couldn't remember the exact number of visits, Aunt testified that Father visited a total of two times during this four month period. One of the visits lasted around 1 1/2 hours, and the other visit lasted "a while." The court found in the amended order that Father failed to visit or only engaged in "token visits" during the four month period prior to his incarceration. The court also pointed out that Father did not seek visitation of M.P.J. through the court; that Father himself testified that he had not been a good father; that M.P.J. did not know Father; that Father had only made "token efforts" to establish a relationship with M.P.J.; and that this lack of relationship was a result of Father's own choices. As to any gifts, Father admitted that he personally had not given M.P.J. any Christmas or birthday gifts prior to his incarceration. And looking to the 4 months prior to his incarceration, it appears that Father had not purchased or sent M.P.J. any gifts. Thus, we cannot say that the evidence preponderates against the trial court's finding that Father engaged in only "token visitation" or "token efforts" to establish some type of relationship with this child.

We do not agree with Father's contention that Aunt thwarted his attempts to see his daughter. A parent's failure to visit could be excused by another person's conduct if that conduct actually prevents the parent from visiting. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946, 950 (1997)). Also, a parent could

be excused for the failure to visit if another person creates "a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* (citations and footnote omitted). The Middle Section of this court has listed examples of the types of conduct that amounts to a significant restraint or interference, including the following: "(1) telling a man he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child." *Id.* at n.34 (citations omitted).

Turning back to the case at bar, there was conflicting testimony as to the number of attempts that Father made to set up visits with M.P.J. Aunt kept a detailed record, which was entered into evidence, indicating that Father called only three times trying to schedule a visit. One of these times Aunt told him to call back later in the week because she was undergoing chemotherapy, but he failed to call back. Father could not remember how many calls he made or the dates of these calls. Father's girlfriend and girlfriend's mother had conflicting testimony as to the number of times that Father allegedly called Aunt. As to the dates of these calls, Father could not remember; Aunt's written record reflects that of these 3 phone calls, none were made during the 4 month time frame prior to Father's incarceration. Christina Flowers, Father's girlfriend, and Pam Flowers both testified that Father made some of these calls to Aunt during the relevant 4 month time frame. As we have previously mentioned, the trial court must find that Father abandoned minor child by clear and convincing evidence, and "insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent evidence of clear and convincing evidence to the contrary." *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). We find no such contrary evidence, as the trial court was in the better position to assess credibility, and chose to accredit Aunt's testimony. We also point out that had Father truly wanted to spend time with M.P.J., he could have petitioned the court for visitation and/or custody. *See **In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007) (holding that the lower court erred in finding that the biological parents abandoned their child when they were actively pursuing legal proceedings to regain custody of the child during the 4 months prior to the termination petition). As Father admitted on cross examination, Aunt had no legal duty to allow him to visit with M.P.J., but that she nevertheless gave him the opportunity. For whatever reasons, Father chose not to take it. While Father testified that he loves M.P.J, we must "not look at protestations of affections and intentions expressed by the natural parents, but look at the past course of conduct." ***In re Gordon***, 980 S.W.2d 372, 374 (Tenn. Ct. App. 1999) (citation omitted). From the record before us, we do not find that Aunt "vigorously resisted" Father's efforts to visit M.P.J.; rather, Father "willfully" failed to visit and thus, the court did not err in finding that Father abandoned M.P.J.

### C. Dependent and Neglect Proceeding: Reasonable Opportunity to Reunite

Father argues that DCS did not afford him with a reasonable opportunity to reunite with M.P.J. Father relies on *In re Tiffany B.*, 228 S.W.3d 148 (Tenn. Ct. App. 2007), but this reliance is misguided. *In re Tiffany B.* dealt with Tenn. Code Ann. § 37-1-166, which places on DCS "the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home. The Department must memorialize its efforts in an individualized *permanency plan* prepared for every dependent and neglected *child placed in its custody*." *Id.* at 158 (emphasis added and citations omitted). When DCS files a petition to terminate a parent's parental rights, DCS must "make reasonable efforts to reunite a family after removing children from their parents' custody. . . . "[T]he Department must not only establish each of the elements in Tenn. Code Ann. § 36-1-113(g)(3)(A) [the statutory ground for termination of parental rights based upon removal of the child pursuant to court order], it must also establish . . . that it made reasonable efforts to reunite the family and that these efforts were to no avail." *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citations and footnote omitted). As to the reunification efforts, "the Department must do more than simply provide the parents with a list of services and send them on their way. The Department's employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified *in the permanency plan*." *Id.* at 519 (emphasis added) (citations omitted).

In this case, Aunt, a family member, initially took temporary custody of M.P.J. and later petitioned the court for termination of Father's parental rights. Thus, DCS was not statutorily required to create a permanency plan or attempt reunification, and the procedures set out in Tenn. Code Ann. § 37-1-166 do not apply. We have rejected a similar argument in the past. For example, in *In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at *6 (Tenn. Ct. App. Dec. 2, 2005) (footnote omitted), the Middle Section of this Court rejected a father's argument that DCS deprived him of the opportunity to participate in the development of the permanency plan because "the development of a permanency plan [] simply does not apply to individual custodians of dependent and neglected children." The Court went on to explain that Tenn. Code Ann. § 37-1-166 "by its express terms applies to orders committing a child to the custody of DCS or continuing such custody." *Id.* at n.9. Thus, Father's argument has no merit.

Father also argues that he did not receive notice of the dependency and neglect proceeding, but this argument also fails, as any previous lack of notice, even if error, was remedied by his participation with counsel at the termination hearing. *See In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *5 (Tenn. Ct. App. July 27, 2001). "A trial court's decision to terminate parental rights 'should not be reversed for any deprivation of due process that occurred at the initial dependency and neglect proceeding when [Father] was afforded full procedural protection at the termination proceeding.'" *In re M.H.*, No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at *5 (Tenn. Ct. App. Dec. 2, 2005) (quoting *In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *5 (Tenn. Ct. App. July 27, 2001)). We also point out that Father

did not have custody of M.P.J, nor had paternity even been established; Father was apparently unable to provide custody as he was in the Gibson County jail during at least a part of the proceeding; "and [Father] had little to add to the dependency and neglect determination" as he was not even in the picture prior to the proceeding. *See id.* at *6. This argument has no merit.

### C. Constitutional Challenge

Father argues that Tenn. Code Ann. § 36-1-113 is unconstitutional. Specifically, Father argues that Tenn. Code Ann. § 36-1-113(g)(6) violates both the Tennessee and United States Constitutions. Section (g)(6) provides a ground for termination of parental rights based on the following:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]

We need not address this argument, as we agree with the Attorney General that Father does not have standing to challenge this specific section. The trial court terminated father's rights due to abandonment – his failure to visit for 4 months prior to his incarceration. Tenn. Code Ann. § 36-1-113(g)(6) was simply not implicated in this case. This Court, in ***In re Adoption of M.J.S.***, 44 S.W.3d 41, 58 (Tenn. Ct. App. 2000), reiterated the following general principle concerning standing:

> The law is well-established that '[a] person has no standing to contest the constitutionality of a statutory provision unless the provision he claims to be deficient has been used to deprive him of his rights.' In accordance with this principle, the courts of this state 'have refused to permit an individual to question the constitutionality of a statute in the absence of a showing that he or she has been adversely affected by it.'

(quotation omitted). Here, the court did not terminate Father's parental rights under § 36-1-113(g)(6), as Father's sentence was less than 10 years. Aunt petitioned the court for the termination of Father's rights based on abandonment, and the court terminated Father's rights based on the statutory ground of abandonment as defined in § 36-1-113(g)(1). Thus, Tenn. Code Ann. § 36-1-113(g)(6) has no bearing on the merits of this case, and Father lacks standing to challenge its provisions.

Since Father lacks standing to challenge Tenn. Code Ann. § 36-1-113(g)(6), we next look to his general argument that § 36-1-113 is unconstitutional because it does not require that the court find proof of a threat of substantial harm to a child "before the state may infringe on the fundamental right of parents to rear their children as they see fit." We begin with the presumption that the statute is constitutional. ***In re Adoption of E.N.R.***, 42 S.W.3d 26, 31 (Tenn. 2001). The trial court specifically found that the statute was constitutional and based this ruling on ***In re Audrey S.***, 182

S.W.3d 838, 881-84 (Tenn. Ct. App. 2005), but we need not address this issue altogether, because it is moot. *See generally* **Henderson v. City of Chattanooga**, 133 S.W.3d 192, 215 (Tenn. Ct. App. 2003) ("our courts will not decide constitutional issues unless resolution is absolutely necessary for determination of the case and the rights of the parties."). The trial court found (1) that the statutory ground of abandonment existed; (2) that it was in the best interest of the child to terminate Father's parental rights; and (3) "[t]hat should Termination of the Parental Rights not occur in this case it would result in a substantial harm to the minor child." Thus, the trial court did find a threat of substantial harm in addition to one of the statutory factors and best interest finding, and therefore, the argument is moot. We nevertheless point Father to **In re Audrey S.**, 182 S.W.3d 838, 881 (Tenn. Ct. App. 2005), in which the Middle Section of this court has already addressed this exact issue and found that the statutory grounds of Tenn. Code Ann. § 36-1-113(g)(1) through (9) satisfies the finding of a threat of substantial harm:

> [A]s long as the [lower] court has correctly found that at least one of the statutory grounds for termination of parental rights exists, the constitutional requirement of a showing of parental unfitness or a risk of substantial harm to the welfare of a child has been satisfied. In effect, the constitutional unfit parent/substantial harm analysis is subsumed within the analysis of whether the statutory grounds for termination have been properly established. A separate finding of parental unfitness or substantial harm, in addition to a finding of the existence of at least one of the statutory grounds, would be redundant.

**In re Audrey S.**, 182 S.W.3d at 882. In conclusion, Father lacks standing to specifically challenge Tenn. Code Ann. § 36-1-113(g)(6), and the general constitutional argument is moot.

## V. CONCLUSION

    For the aforementioned reasons, we affirm. Costs of the appeal are assessed against Appellant, Jason Randall Johnson, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-18-